TATE, Judge.
This is a suit by landowner-lessors to cancel a mineral lease. The ground of cancellation urged is the failure of the defendant lessee-interests to pay shut-in gas royalty as allegedly required by the lease. The plaintiff landowners appeal from the dismissal of their suit.
Pertinently, the undisputed facts are:
The plaintiffs are owners in indivisión of a 30-acre tract. In 1959, the defendant lessee obtained two mineral leases from the plaintiff lessors providing for an annual delay rental totalling $450 each year during the leases’ five-year primary terms. These delay rentals were paid in August of 1960, 1961, and 1962.
By Commissioner’s Order 116-A, effective December 1, 1962, a portion of the plaintiffs’ tract was included within an 80-acre drilling unit created as authorized by the Louisiana conservation act, LSA-R.S. 30:1 et seq. The commissioner’s unit was formed for the “production of oil” from a described ‘‘Oil Sand”. The designated unit well was described as situated as most efficiently and economically to drain the acreage assigned to the drilling unit.
The unit zvell was not located on the portion of the plaintiffs acreage included within the unit. The well was completed on December 11, 1962. However, although completed in the unitized sand, nevertheless *534 from this sand the well was not capable of producing oil in commercial quantities, only gas condensate. Prior to filing of this suit in September 1963 to cancel the lease, no unit production took place of either gas or oil from the unitized sand.
No shut-in royalty was paid to the plaintiffs-lessors as a result of this non-producing gas well situated on the other land which had been unitized with a portion of the plaintiffs’ tract for drilling for and production of oil. However, in August of 1963, immediately prior to suit, the lessee interests did deposit to the plaintiffs’ credit the $450 delay rentals required under the terms of the lease to keep it in effect when there was no prior drilling on or production from the leased premises.
The plaintiffs contend, however, that instead they are entitled to shut-in gas royalty of (only) $200 annually, since the unit drilling operations resulted in completion of a unit gas well capable of production hut shut-in.
The basic demand of the plaintiffs’ suit is that the mineral lease should be can-celled because the defendant lessees failed to pay shut-in gas royalty as required under the plaintiffs’ interpretation of the lease provision. The defendant lessees basically insist that the shut-in gas royalty provision of the lease never became operative, because the shut-in gas well in question was drilled in a commissioner’s forced-pooling unit created only for the production of oil, and thus cannot he considered a unit well serving the leased premises within the meaning either of the conservation act or of the lease itself. (This being so, the defendant lessees insist that their obligation under the lease was to continue to pay annual delay rentals, as was done.)
In urging that the lessees defaulted in their lease obligation to pay shut-in royalty, the plaintiffs rely upon jurisprudence to the following effect: Under mineral leases containing a shut-in gas royalty clause similar to the present,[1] generally the lessee must pay the shut-in gas royalty to mineral and royalty owners, instead of delay rentals, when production from the shut-in well would be attributable to the leased premises, including when a-portion of the leased premises is validly unitized within a production unit served by the shut-in unit well. Davis v. Laster, 242 La. 735, 138 So.2d 558, 96 A.L.R.2d 332; also: Odom v. Union Producing Co., 243 La. 48, 141 So.2d 649; Delatte v. Woods, 232 La. 341, 94 So.2d 281; LeBlanc v. Haynesville Mercantile Co., 230 La. 299, 88 So.2d 377.[2] See also Howard, Problems of' Interpreting and Applying Shut-in Clauses,. 11 Institute on Mineral Law 3 (LSU, 1964).
The defendant lessees argue that: such jurisprudence is not applicable to the-present facts. The distinguishing feature-alleged is that, if there were gas production; *535 from the present shut-in well, it would not be attributable to the leased premises.[3]
Here, the commissioner created an 80-acre drilling unit for “the exploration for and production of oil" within a specified sand. Order 116-A., Tr. 85. This unit was created by virtue of the statutory authority ■set forth in the conservation statute to authorize forced-pooling of “the maximum area which may be efficiently and economically drained by one well”, for the statutory purpose of “the prevention of waste and to avoid the drilling of unnecessary wells.” See LSA-R.S. 30:9, especially subsection B.
It is conceded and the record reflects •that a larger acreage is unitized for the ‘drilling for and production of gas condensate instead of oil. For example, for the present field, a 220-acre gas condensate unit was the standard as compared with an 80-acre oil unit. The defendant lessees point out that the present well, drilled unsuccessfully for oil, could receive no allowable to produce gas or gas condensate until the original 80-acre forced-pooling oil unit was reconstituted so as to include the larger surface area to be drained by a gas well.[4] See Commissioner’s General Order 29-F, Section 3, as amended July 1, 1959.
In summary, the defendant lessees contend that nowhere in the lease itself nor in the conservation act is there warrant for us to consider the present shut-in gas well, which was not situated on the leased tract, to be a shut-in gas well within the meaning of the defendants’ mineral lease affecting the plaintiffs’ tract.
We agree. For this reason, we hold that the defendants were not obliged to pay shut-in gas royalty and were not in default in this regard, which is the sole basis of cancellation of the mineral lease urged by the plaintiffs.
True, by virtue of a commissioner’s forced pooling order, a portion of the leased tract was unitized with the acreage on which the well was drilled for the purpose of exploring for and producing oil, and the good-faith drilling for such within the unit constituted for some purposes a drilling also of the leased premises within the meaning of the mineral lease as modified by the conservation laws. LSA-R.S. 30:9; Delatte v. Woods, 232 La. 341, 94 So.2d 281.
Likewise, if as a result of these drilling operations the well had been completed capable of producing the product which the acreage had been unitized to produce (as the most efficient area to be drained by that single unit well), then the production from the completed well so resulting would by statute be "considered” as if produced from the leased tract. LSA-R.S. 30:10. Such would have had the further consequence that, if the well were shut-in after being completed, the lessees would be obligated to pay shut-in gas royalty in the same manner as if the shut-in (successfully completed) well were situated on the leased premises itself instead of merely on a tract unitized with it. Odom v. Union Producing Co., 243 La. 48, 141 So.2d 649, 663-664.
But here the acreage was unitized for the production of oil, but the well could not be completed successfully for oil pro *536 duction from the unitized sand. With regard to the unitized acreage (aside, of course, from the tract on which the well was situated), this well was therefore not a completed well capable of production within the meaning of the compulsory-unitization order, because under the order’s terms the unit was created only for the drilling for and production of oil from a certain sand.
That is, there could be no production of gas attributable to the oil drilling unit, because (in the absence of further finding by the commissioner) the unit well was not situated to drain the unitized area most efficiently and economically for gas as required by statute. See LSA-R.S. 30:9, subd. B. For this reason also, production from the well of anything other than the oil which the leased acreage was legally unitized to produce could not be statutorily “considered,” see LSA-R.S. 30:10, subd. A(l) (b), as produced from the leased acreage itself.
Here, then, the well drilled on the unit did not result in production within the meaning of the drilling order which created the unit to produce a certain mineral substance only. Thus, with regard to the compulsory drilling unit, the unit well is to be regarded as incapable of producing the substance for the production of (only) which the acreage was force-pooled. Likewise, with regard to the non-drilled tracts included in the unit (which were force-pooled with the drilled-tract for the sole purpose of producing the given substance), the unit well is simply a well situated on a nearby tract, since the drilling pursuant to the unitization was unsuccessful insofar as the unitizing order is concerned.
This result does not differ because this well, unsuccessful insofar as the unit is concerned, may nevertheless be utilized to produce some other mineral substance than that for the most efficient drilling for and production of which (only) the force-pooling order unitized the tracts. The production of this other substance from the former unit well cannot statutorily be “considered” as production from these non-drilled tracts included within the surface of the unit, unless the latter are validly unitized with the drilled-tract for such production.
In the present case, the non-drilled tract of the plaintiffs was validly unitized with the drilled-tract only for the purposes of the production of oil from a given sand. The plaintiffs’ tract was not unitized with the other for the production of gas or gas condensate.
Since the two tracts were not unitized with regard to the production of such latter substances, any production of gas from the former unit’s well would not statutorily be considered as from the plaintiffs’ tract also. The plaintiffs thus would not be entitled to share in any gas production from the well of the former oil-unit, in the absence of further order of the commissioner with appropriate finding unitizing the plaintiffs’ tract with the well-tract for purposes of gas production (as was subsequently done, see Footnote 4).
Under the jurisprudence relied upon by the plaintiffs, they are not entitled to shut-in royalty unless they were entitled to share in the production of a well which is capable of producing but which is shut-in. There is likewise no pooling or other provision of the defendants’ mineral lease affecting the plaintiffs’ land by reason of which the well on the nearby tract, capable of producing gas but shut-in, gives rise to any obligation on the part of the defendants to pay shut-in royalty.
We conclude therefore, as did the trial court, that the defendant lessee-interests breached no lease obligation to pay shut-in royalty, and that the plaintiffs’ suit for cancellation should be dismissed, based as it is solely upon the defendants’ alleged default in this regard. In passing, we note that we do not reach the defendants’ substantial contention that cancellation was not an appropriate remedy in the present cir *537 cumstances, see Davis v. Laster, 242 La. 735, 138 So.2d 558, 96 A.L.R.2d 332.
For the foregoing reasons, the judgment •of the district court dismissing the plaintiffs’ suit is affirmed at their cost.
Affirmed.

. Clause 3(b) (5) of tbe present lease provides : “While gas or condensates from a gas well is not sold or utilized off tbe premises Lessee may pay or tender to Lessor or to tbe credit of Lessor in the depository Bank named below, at the rate of $200.00 per year, payable quarterly, for such time as said gas or condensate is not sold or utilized off tbe premises, and upon such payment by Lessee to Lessor it will be considered that gas is being produced from said land. * * * ”

. We realize that, inter alia, variable lease pooling provisions, if applicable, may vary the validity of the general statement in the opinion, as can be seen by reference to the decisions cited in support of it. However, Clause 18 of the present lease regulates only the effect of voluntary pooling as authorized by this clause of this lease, and it does not refer to compulsory-pooling by commissioner’s order. Thus, the effect of pooling in the present case is not regulated by any lease provision, only by the statutory provisions of the-Louisiana conservation act, LSA-R..S. 30 :1 et seq. The opinion’s general statement is valid for present purposes, i. e.t. within the context of the present facts.

. At least, prior to a certain subsequent conservation pooling order issued after this was filed. See Footnote 4 below.

. In fact, in the present case (shortly after suit), the old oil-units of Order 116-A were abolished, and new and larger 220-acre units created for the efficient production of gas condensate. Order 116-A-2, effective November 6, 1983. Tr. 89. The former unit’s well (Nolan Farms #1), previously shut-in, then received a gas condensate allowable, and the plaintiffs received production royalties insofar as a portion of their tract was included within these gas condensate units. It is conceded that such royalties have kept the lease in force, if indeed the lessees’ payment of delay rentals in August 1963 (instead of shut-in gas royalty, as demanded by plaintiffs) did have the effect of satisfying the lessees’ obligations under the lease, as the lessees contend.